IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| FROST & SULLIVAN INC., <br><br> Plaintiff, <br><br> v. <br><br> DARRELL HUNTSMAN, <br><br> Defendant. | Civil Action No. 5:23-cv-1153 <br><br> **JURY TRIAL DEMANDED** |

**FROST & SULLIVAN INC'S COMPLAINT**

Plaintiff Frost & Sullivan Inc. ("Frost" or the "Company"), for its Complaint against Defendant Darrell Huntsman, alleges as follows:

**NATURE OF THE ACTION**

1. Frost brings these claims against its former Chief Executive Officer, Darrell Huntsman. For more than two years, Mr. Huntsman abused his position as CEO to mislead and defraud Frost. Despite his representation and reassurances that he was working for Frost's benefit—as he was legally obligated to do as Frost's CEO—, Mr. Huntsman instead engaged in a surreptitious effort to (1) embezzle over $1,000,000 to his personal contact in a third party company, (2) secretly have Frost pay for software development to benefit his own planned company ("NewCo"); (3) gave NewCo access to Frost's highly confidential and proprietary data; and (4) misappropriate Frost's trade secrets, for his personal benefit and the benefit of NewCo.

2. As detailed below, Mr. Huntsman embezzled Frost's money by entering into a no-bid, $45,000-$60,000 per month contract with Endeavor, whose CEO was a long-time friend of Mr. Huntsman. Over the course of nearly two years, Frost paid Endeavor over $1,000,000 for

1

which Frost received a substandard, largely unusable platform that should have cost a small fraction of the $1,000,000 investment. Mr. Huntsman also created significant risk for Frost by enabling Endeavor to maintain control of Frost assets supported by this investment, including the source code, server accounts and third-party applications and software.

3. Moreover, Mr. Huntsman used Endeavor to funnel at least $55,000 to a secret project with a third-party software developer, Exaptive, Inc. ("Exaptive"). Upon further investigation, Frost learned that Mr. Huntsman then traveled to Saudi Arabia (using Frost's money) to solicit funding from Frost's long-time client Saudi Aramco for NewCo, using the proof of concept that Exaptive created (with Frost's money).

4. Frost, hereby, brings this action to vindicate its rights and recover damages that it is entitled to under the law.

## PARTIES

5. Plaintiff Frost is a Delaware corporation and has its principal place of business in San Antonio, Texas. The address of the registered office of Frost is 7550 1H, 10 W Drive, Suite 400, San Antonio, TX 78229.

6. Defendant Darrell Huntsman is a former employee of Frost. Upon information and belief, Mr. Huntsman is a resident of Salt Lake City, Utah and resides at 1919 S 4800 E Heber City, UT 84032. As CEO of Frost, and for most times relevant to this complaint, Mr. Huntsman was based out of Frost's San Antonio, Texas office.

## JURISDICTION AND VENUE

7. This Court has subject-matter jurisdiction over this action pursuant 28 U.S.C. § 1331 because this action arises under the laws of the United States, including 18 U.S.C. § 1836(c).

8. This Court also has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9. This Court has supplemental jurisdiction over the remaining claims asserted herein pursuant to 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts as the federal claim.

10. Under 28 U.S.C. § 1391(b)(2), venue is proper in this judicial district because a substantial part of the Mr. Huntsman's tortious activities that give rise to the Frost's claims occurred in Frost's San Antonio headquarters.

## FACTUAL BACKGROUND

### A.   Formation of Frost

11. Frost & Sullivan is a research, data analytics, and consulting firm. Since its founding in 1961, Frost has been a pioneer and leader in market research and consulting.

12. Today, Frost employs approximately 1,200 employees. Frost's offices are located throughout the world in North America, South America, Europe, Africa, and Asia.

13. Frost provides consulting services, research, and data analytics in a wide array of industries including aerospace and defense, chemicals, materials and nutrition, energy and environment, healthcare, industrial, information and communications technology, mobility, security, and supply chain and logistics.

14. Frost offers its industry-leading services through proprietary methods and information, which involves the deep analysis of markets, technologies, economies related to trends and opportunities, forecasts, and competitive analysis. Frost's services are organized by industry, product, and technology, and can even be tailored to specific clients. Frost has

developed its research, analytics, and consulting model based on decades of experience in the field.  Therefore, Frost's data and analysis is highly confidential.

15. Public disclosure of Frost's confidential information would lead to significant and irreparable harm.  Therefore, Frost's data is not disseminated outside of Frost without explicit consent and is not publicly available.

**B.     Huntsman Joins Frost in 2019 as CEO**

16. In 2019, Frost engaged with a private equity firm named Satori Capital ("Satori") to raise additional capital to expand its operations.  Mr. Huntsman was an unpaid representative of Satori at the time.  While Frost's deal with Satori eventually fell through, Satori recommended that Frost hire Mr. Huntsman.

17. In 2019, Mr. Huntsman joined Frost as its new Chief Executive Officer, based in Frost's San Antonio headquarters.

18. In or around June of 2020, Mr. Huntsman was appointed to Frost's Board of Directors.

**C.     Huntsman Embezzles Over $1,000,000 to A Friend at Endeavor Through a No-Bid Contract**

19. In or around May 2021, Mr. Huntsman led the development of a new analytics portal for Frost that would allegedly streamline content creation and delivery, thereby enhancing Frost's customer experience.  Despite his representations and legal obligations to act in the best interest of Frost, Mr. Huntsman's actual actions indicate that he engaged in this project solely to benefit NewCo, Mr. Huntsman, and his business collaborators.

20. First, Mr. Huntsman did not consult Frost's IT department regarding this project, even though the IT department is trained and knowledgeable about Frost's current platform.  It is likely that Frost's own IT department could have developed the portal in-house or otherwise

guided a third-party vendor on the development, thereby saving Frost significant money. Instead, Mr. Huntsman engaged a Turkish company, Endeavor Technology ("Endeavor"), to create the new analytics portal.

21. Second, contrary to Frost's internal policies which require that the person overseeing any significant project obtain competitive bids from multiple potential contractors, Mr. Huntsman did not solicit bids from other contractors before engaging with Endeavor. Upon information and belief, Mr. Huntsman was aware of this policy because he had led several other projects involving third parties, and he obtained competitive bids in each of the other projects. Upon information and belief, Mr. Huntsman also knew that Frost does not allow any exceptions to this requirement.

22. Upon information and belief, Mr. Huntsman engaged with Endeavor in a no-bid contract because Endeavor's CEO was Mr. Huntsman's longtime friend.

23. Third, Mr. Huntsman's contract with Endeavor was barebones, bereft of any concrete timelines or deliverables. Ultimately, Frost's analytics portal project served as a cash-cow for Endeavor's CEO, allowing Mr. Huntsman's longtime friend to collect monthly payments of $45,000 to $60,000 for nearly two years while doing little work to justify the expense. In fact, each time Frost's Board of Directors tried to get insight into the status of the development of the analytics portal project, Mr. Huntsman intentionally blocked the Board's inquiries and reassured the Board members that the project was proceeding as planned.

24. In total, Frost paid over $1,000,000 to Endeavor for the analytics portal project, yet the software that was delivered lacked most of the key functionalities that Mr. Huntsman had promised. Upon information and belief, Mr. Huntsman knew or should have known that the

product the Endeavor developed was not worth $1,000,000, and that Frost grossly overpaid Endeavor.

### D. Mr. Huntsman Uses Endeavor To Divert Frost Money To Exaptive to Develop Software For NewCo

25. Upon information and belief, in or around January 2022, Endeavor (at the direction of Mr. Huntsman) engaged a software development company, Exaptive, to develop a proof of concept for a new AI engine.  In particular, Mr. Huntsman arranged for at least $55,000 paid by Frost to Endeavor to be diverted to Exaptive for its work on the AI project.

26. For at least the reasons identified below, Frost is informed and believes, and thereon alleges, that the secret Exaptive project was intended to benefit NewCo rather than Frost.

27. First, although the Statement of Work with Exaptive states that the project was on behalf of "Frost and Sullivan" for a project named "Frost & Sullivan Newco," the Statement of Work was signed by Endeavor, payments were made through Endeavor, and the Frost Board had no knowledge of the secret Exaptive project.

28. Second, Mr. Huntsman used his personal Gmail account to communicate with Exaptive and Endeavor rather than his Frost company email.

29. Third, on the Exaptive project, Mr. Huntsman worked in concert with Abrar Hussain, a former Frost Board member who at all relevant times had no position or role at Frost and indeed had been removed from the Frost Board shortly before the events in question.

30. Fourth, Exaptive's AI engine is completely unrelated to the analytics portal project that Endeavor was allegedly building.

31. Fifth, upon information and belief, Exaptive's AI engine was unrelated to any other project that Mr. Huntsman was developing at Frost.

6

32.     Sixth, in or around June 2022, Mr. Huntsman arranged a meeting with Frost's longtime client Saudi Aramco, for the purpose of securing funding for NewCo as well as a project for NewCo.  Present at this meeting were Mr. Huntsman, Mr. Hussain, and David King, CEO of Exaptive, among others.  Upon information and belief, Mr. Huntsman directed Mr. King to demonstrate the Exaptive AI engine to Saudi Aramco, and Mr. Huntsman represented to Saudi Aramco that the Exaptive AI engine would be a key feature of NewCo.

### E.   Mr. Huntsman Grants Exaptive Access to Frost's Confidential API to Develop Software for NewCo

33.     Upon information and belief, as part of Exaptive's software development efforts, in or around April 2022, Mr. Huntsman provided Exaptive with Frost's application programming interfaces ("API").

34.     Mr. Huntsman did this without Board approval, even though doing so allowed Exaptive access to Frost's highly confidential market data and analysis, which are its crown jewels.  More troubling is the fact that Exaptive had signed a statement of work with Endeavor and not Frost.  Therefore, Exaptive had no contractual relationship or obligations to Frost but was given full access to Frost's confidential market data and analysis.

35.     Given what Frost now knows about the arrangement among Mr. Huntsman, NewCo, Endeavor, and Exaptive, Frost is informed and believes that Mr. Huntsman intended to use the AI engine to leverage Frost's confidential information for the benefit of NewCo and himself.

### F.   Frost Uncovers Mr. Huntsman's Fraud and Misappropriation

36.     In August 2023, Frost became aware of a $55,000 payment to Endeavor for an "AI Initiative."  When Frost reached out to Endeavor for an explanation regarding the scope of the project, Endeavor disclaimed any involvement in the project.  Instead, Endeavor explained

that the money was directly re-routed to Exaptive at Mr. Huntsman's direction and that Endeavor explained that it was simply an intermediary.

### G. Mr. Huntsman Recruits Employees to Leave Frost and Continues To Represent Himself as CEO of Frost After He Was Terminated

37. Upon information and belief, during the entire time Mr. Huntsman was the CEO of Frost, he also maintained his position as an Operating Partner of an investment company named RLG Capital.

38. Upon information and belief, while he was still CEO of Frost, Mr. Huntsman approached and tried to recruit numerous Frost employees to leave Frost and join other companies with which Mr. Huntsman has a relationship.

39. In addition, upon information and belief, Mr. Huntsman continued representing himself as CEO of Frost to Saudi Aramco through at least June 2023, in order to further his business interests and those of NewCo, even though his employment with Frost was terminated on December 31, 2022.

## COUNT I

## Misappropriation of Trade Secrets

**(Defense of Trade Secrets Act – 18 U.S.C. § 1831 *et seq.*; Section 134A.002(6) of the Texas Uniform Trade Secrets Act *et seq.*)**

40. Frost restates and incorporates by reference each of the allegations set forth in Paragraphs 1-39 above as fully set forth herein.

41. Frost is the owner of valuable trade secrets related to data and services used in, or intended for use in, interstate or foreign commerce. Such trade secrets comprise Frost's financial, business, and economic information, including but not limited to data related to the analysis of markets, technologies, and economies related to trends, opportunities, forecasts, and

competitive analysis (the "Trade Secrets"). Frost's highly confidential APIs can be used to access this Trade Secret information.

42. The Trade Secrets are not subject to public knowledge and not known to those in the field. Nor are the Trade Secrets readily ascertainable by others in the field.

43. Frost has taken reasonable measures to maintain the secrecy of the Trade Secrets as described above in Paragraph 15.

44. The Trade Secrets derive independent economic value from not being generally known.

45. The Trade Secrets implicate interstate and foreign commerce through, among other things, Frost's work across the United States and overseas, including in Saudi Arabia.

46. Mr. Huntsman acquired, disclosed and/or used the Trade Secrets without Frost's express or implied consent by giving Exaptive access to Frost's confidential APIs without the approval of the Frost Board. Frost is informed and believes, and thereon alleges, that Mr. Huntsman intended to use Frost's confidential information for his own benefit and has already done so.

47. Mr. Huntsman also used improper means to acquire, disclose, and/or use the Trade Secrets by leveraging Frost's confidential business relationships to set up meetings with Saudi Aramco to the benefit of NewCo and to the harm of Frost.

48. Mr. Huntsman's misappropriation of the Trade Secrets is in violation of the Defense of Trade Secrets Act and the Texas Uniform Trade Secrets Act.

49. Mr. Huntsman's misappropriation of the Trade Secrets has caused Frost harm and financial losses, in an amount exceeding the jurisdictional minimum of this court, to be proven at trial.

## COUNT II

### Breach of Fiduciary Duty

50. Frost restates and incorporates by reference each of the allegations set forth in Paragraphs 1-49 above as fully set forth herein.

51. By virtue of his position as chief executive officer and as a member of the Board of Directors, Mr. Huntsman owed fiduciary duties of honesty and loyalty to Frost and its shareholders.

52. Mr. Huntsman has breached his fiduciary duties.

53. First, Mr. Huntsman failed to solicit bids for the software development project for creating an analytics portal for Frost, and instead paid over $1,000,000 to a company that he had personal connections to, which he knew was not in the best interests of Frost.

54. Second, Mr. Huntsman hid the development of the Exaptive proof of concept from Frost by having Endeavor engage Exaptive and maintaining all communications with Exaptive through his personal Gmail account, in order to pursue the Exaptive project using Frost funds, all for the benefit of NewCo rather than Frost.

55. Third, Mr. Huntsman caused at least $55,000 intended for the Endeavor project to be diverted to the secret Exaptive project. Mr. Huntsman further misappropriated Frost's API and granted Exaptive access to Frost's Trade Secrets so that Exaptive could develop software for Mr. Huntsman's NewCo.

56. Fourth, Mr. Huntsman leveraged the relationship with Frost's longtime client Saudi Aramco to try to secure funding for Mr. Huntsman's NewCo and to secure a lucrative consulting contract for NewCo.

57. Fifth, while CEO of Frost, Mr. Huntsman actively recruited Frost's employees to leave Frost and join other companies with whom Mr. Huntsman enjoyed a relationship.

58. Each of these actions show a clear failure by Mr. Huntsman to act in good faith and loyal behavior towards Frost. Huntsman's disloyal conduct has harmed Frost in an amount exceeding the jurisdictional minimum of this court, to be proven at trial.

59. Frost has been damaged and irreparably harmed by Mr. Huntsman's breach of fiduciary duty. In addition to recovering actual damages, the Court should order Mr. Huntsman to disgorge all monies Frost paid him during the time he was in breach of his fiduciary duties.

## COUNT III

### Conversion

60. Frost restates and incorporates by reference each of the allegations set forth in Paragraphs 1-59 above as fully set forth herein.

61. Mr. Huntsman has wrongfully exercised dominion or control over, and/or wrongfully took, misappropriated, or converted Frost's personal property in denial of, or inconsistent with, Frost's rights in such property, to the detriment and damage of Frost in excess of the jurisdictional limits of this Court.

62. In particular, Mr. Huntsman used at least $55,000 of Frost funds to funnel payments to Exaptive to develop software that he intended to use to benefit NewCo rather than Frost.

63. Moreover, as part of Exaptive's software development, Mr. Huntsman unlawfully misappropriated Frost's confidential information by giving Exaptive access to Frost's highly confidential APIs and thereby access to Frost's highly confidential and proprietary market data and analysis.

64. Frost is, and always has been, the true, sole and exclusive owner of the funds which were improperly and without consent, wired to Exaptive. Frost is also the true, sole owner

of Frost's Trade Secrets, which were misappropriated by Mr. Huntsman to benefit his personal business venture.

65. Mr. Huntsman willfully and without legal justification interfered with Frost's right to ownership of the funds and Frost's Trade Secrets.

66. Frost at no time consented, expressly or impliedly, to Mr. Huntsman's wiring of funds to Exaptive, or the transmission of Frost's Trade Secrets to Exaptive.

67. Frost has been damaged and irreparably harmed by Mr. Huntsman's conversion in an amount exceeding the jurisdictional minimum of this court, to be proven at trial.

## COUNT IV

### Claim for Damages

**(Texas Theft Liability Act)**

68. Frost restates and incorporates by reference each of the allegations set forth in paragraphs 1-67 above as fully set forth herein.

69. Mr. Huntsman is liable to Frost under the Texas Theft Liability Act.  Tex. Civ. Prac. & Rem. Code § 134.001 et seq.

70. Frost had a possessory right to monies and property Mr. Huntsman took from Frost.

71. In particular, Frost had a possessory right to the $55,000 Mr. Huntsman funneled to Exaptive to develop software that he intended to use to benefit NewCo rather than Frost.  Frost also had a possessory right to the confidential information Mr. Huntsman misappropriated by giving Exaptive access to Frost's highly confidential APIs and thereby access to Frost's highly confidential and proprietary market data and analysis.

72. Mr. Huntsman took these funds from Frost in violation of Section 31.03 of the Texas Penal Code.

73. Mr. Huntsman intentionally deprived Mr. Huntsman of these funds resulting in damages to Frost. Frost is entitled to recover their actual damages as well as statutory damages and attorneys' fees. Tex. Civ. Prac. & Rem. Code §§ 134.005(a)(1) and (b).

## COUNT V

## Fraud

74. Frost restates and incorporates by reference each of the allegations set forth in paragraphs 1-73 above as fully set forth herein.

75. Mr. Huntsman engaged in a wide-reaching fraudulent scheme to steal money and resources from Frost.

76. For example, on or around May 2021, Mr. Huntsman made false material representations that the development of the Endeavor analytics portal project was done for the benefit of Frost and its customer base. Contrary to his representations, Mr. Huntsman used the Endeavor project to line the pockets of the CEO of Endeavor, who is Mr. Huntsman's close friend. In particular, he engaged Endeavor without soliciting competing bids, leading to Frost paying Endeavor over $1,000,000 to develop software that Mr. Huntsman knew or should have known was fundamentally lacking and not worth $1,000,000.

77. Furthermore, contrary to his representations that the Endeavor analytics portal project was to benefit Frost, on or around March 2022, Mr. Huntsman diverted $55,000 of Frost's money to the secret Exaptive project to develop software for Mr. Huntsman's NewCo.

78. In or around June 2022, Mr. Huntsman also represented that he was traveling to Saudi Arabia to develop business to benefit Frost. However, he used Frost's money to pay for the trip in order to unlawfully solicit investments from Saudi Aramco to benefit Mr. Huntsman's NewCo. Moreover, Mr. Huntsman solicited these investments by demonstrating the secret project that Exaptive developed with Frost's money.

79. Mr. Huntsman intended to induce Frost to act upon the false representations.

80. Frost relied on the false representations of Mr. Huntsman, which caused injury and harm to Frost.

**Exemplary Damages**

81. Frost restates and incorporates by reference each of the allegations set forth in paragraphs 1-80 above as fully set forth herein.

82. As a result of Mr. Huntsman's breach of fiduciary duty, fraud, unjust enrichment, conversion, and violation of Texas Theft Liability Act, Frost is entitled to recover exemplary damages from Mr. Huntsman. Tex. Civ. Prac. & Rem. Code § 41.003. Mr. Huntsman's conduct was both fraudulent and malicious. Moreover, because Mr. Huntsman's conduct involves misapplication of fiduciary property and theft – both felonies – the statutory cap on damages in inapplicable. *Id.* at § 41.008(c)(10) and (13).

**PRAYER FOR RELIEF**

WHEREFORE, Frost respectfully prays for judgment in favor of Frost and against Mr. Huntsman as follows:

A. Granting Frost Damages in an amount to be determined at trial.

B. Granting a permanent injunction against Mr. Huntsman from using Frost's confidential information to benefit NewCo or any other person or entity and unfairly compete against Frost.

C. Enhancing any actual damages for Mr. Huntsman's willful misappropriation of trade secrets.

D. Exemplary Damages.

E. Granting Frost an award for all reasonable attorneys' fees and other costs and expenses incurred.

  F. Granting Frost such other and further relief as the Court deems just and proper.

| | |
|---|---|
| Dated: September 15, 2023 | By: */s/ David M. Prichard* <br> David M. Prichard (Bar No. 16317900) <br>  dprichard@prichardyoungllp.com <br> PRICHARD YOUNG LLP <br> 10101 Reunion Place, Suite 600 <br> San Antonio, Texas 78216 <br> Telephone: (210) 477-7400 <br> <br> Mark D. Flanagan (*pro hac vice forthcoming*) <br>  Mark.Flanagan@wilmerhale.com <br> Khoa Tran (Bar No. 24115705) <br>  Khoa.Tran@wilmerhale.com <br> Sarah E. Maciel (*pro hac vice forthcoming*) <br>  Sarah.Maciel@wilmerhale.com <br> WILMER CUTLER PICKERING <br>  HALE AND DORR LLP <br> 2600 El Camino Real, Suite 400 <br> Palo Alto, California 94306 <br> Telephone: (650) 858-6000 <br> Facsimile: (650) 858-6100 <br> <br> *Attorneys for Plaintiff Frost & Sullivan Inc.* |